Cindy LANE, et vir., etc., Plaintiffs,

v.

LINCOLN COUNTY HOSPITAL, et al., Defendants.

No. CIV–4–80–56.

United States District Court,
E. D. Tennessee,
Winchester Division.

Feb. 19, 1982.

Edward H. Stevens, Huntsville, Ala. and David Kozlowski, Tullahoma, Tenn., for plaintiffs.

William R. Willis, Jr., Frank Grace, Jr., Robert L. DeLaney, Nashville, Tenn., for defendants.

## MEMORANDUM OPINION

NEESE, District Judge.

The first child of the plaintiffs was born at the defendant Lincoln County Hospital (Hospital). It was delivered there by Dr. Paul E. Whittemore, an obstetrician with privileges of practicing his professional-specialty in that Hospital.

The plaintiff Mrs. Cindy Lane became pregnant a second time. She received no prenatal care; the plaintiffs intended that she would return to the Hospital, which served her territorial area, when she went into labor, at age 18, expecting Dr. Whittemore to again attend her delivery.

On the late evening of January 3, 1980, some 18 months after she had first given birth, Mrs. Lane experienced labor-pains, and she and her husband and others returned to the Hospital. She was sent to its department of obstetrics and thence to its labor-room, where she was dressed in a gown and examined. During this examination, it was recognized that Mrs. Lane had received no prenatal care and had not arranged for her expected child to be delivered by Dr. Whittemore.

Thereupon, it was decided that Mrs. Lane could only be admitted through the Hospital's emergency-room. She redressed in her street clothing and walked to the emergency-room. The emergency-room physician on duty was not present physically in the Hospital, did no obstetrical functions, and declined to come to the Hospital to attend Mrs. Lane. Dr. Whittemore was then contacted, and he requested that Mrs. Lane be reexamined and her condition reported to him.

Mrs. Lane was taken thereupon to the Hospital's labor-room again, redressed in a gown, and reexamined. A nurse found her dilated to 6 centimeters. When this report was received by Dr. Whittemore, he stated that he did not deem Mrs. Lane his patient and, therefore, would not attend her in her labor.

The operating procedures of the Hospital at that time called for the hospital-personnel to refuse admission for treatment, except in emergent conditions, to any one who had not been admitted at the direction of a member of its medical staff of physicians who were privileged to use its facilities.

Thus, Mrs. Lane was returned to the emergency-room of the Hospital: a pregnant female who had not received prenatal care, such as she, was considered by the nursing-personnel of the Hospital to be in a "high-risk" pregnancy. Fortunately, Mrs. Lane's baby was delivered at another hospital in another (but nearby) state, and both mother and child did, and do, well.

Mrs. Lane and her husband brought this action against the Hospital and its chief executive officer for thus subjecting her, a citizen of the United States, or causing her to be subjected, under color of Tennessee law, to the deprivation of what they claim was a right secured to her by a law of the United States. 42 U.S.C. § 1983. They claim she was deprived of her right discriminatorily on a ground unrelated to her need for obstetrical service which was provided to other women also in the territorial area of that Hospital: that being, because she had not received prenatal care and had no obstetrician who would authorize her admission to the Hospital and give her care there during the latter stages of her pregnancy and labor.

Mrs. Lane at the pertinent time was a citizen of the United States. The Court has jurisdiction of the parties and has jurisdiction of the subject-matter of a claim under 42 U.S.C. § 1983. 28 U.S.C. §§ 1343(a)(3), (4).

A question at the threshold is whether the Hospital and its administrator were acting at the pertinent times under color of Tennessee law. Undoubtedly, in this situation they were.

Lincoln County, Tennessee (County) is one of the divisions into which the state of Tennessee divided itself. T.C.A. § 5–1–101. It is a corporate- or quasi-corporate-entity, T.C.A. § 5–1–103, suable for any just claim against it in the same manner in which lawsuits may be maintained against other Tennessee corporations. T.C.A. § 5–1–105.

Its powers, duties and liabilities are prescribed by statutes of the state of Tennessee. *Armitage, et al. v. Holt No. 1,* C.A. Tenn. (1937), 21 Tenn.App. 273, 275, 109 S.W.2d 411, certiorari denied by the Supreme Court of Tennessee (1937).

The County was empowered by the state of Tennessee to build and operate a hospital. Private Acts of Tennessee of 1931, ch. 267, § 2; Private Acts of Tennessee of 1949, ch. 270, § 1. The latter enactment authorized the Hospital to create indebtednesses by the issuance of its bonds and provided that, otherwise, it was to be self-supporting from current revenues it received. The County receives no taxes from the Hospital; however, out of its self-sustaining revenues, the County also operates its nursing-home and ambulance-service at no other governmental cost.

The County operates the Hospital through its health-facilities committee. There were 6 such committeemen on January 3, 1980, all nominated and elected by the County Commissioners of the County. These committeemen had complete charge, control and management of the Hospital's business-affairs, property and funds, subject *inter alia* to inconsistent policies or resolutions of the County Commissioners of the County, statutes of the state of Tennessee, and federal laws.

■ " * * * [S]tate action * * * may be brought about through the State's * * * agencies just as through its legislature. * * * " *Robinson v. Florida* (1964), 378 U.S. 153, 156, 84 S.Ct. 1693, 1695, 12 L.Ed.2d 771, 773–774 (headnote 2) (where the state's regulations required separate facilities for the races). For our purposes here, the County was an agency of the state of Tennessee engaging in state-action.

The Hospital applied on December 9, 1947 to the Federal Security Agency of the United States Public Health Service, for federal financial assistance with a construction project. *Inter alia* therein, the Hospital agreed that, when such project was completed, it " * * * will be operated and maintained in accordance with [the] minimum standards prescribed by the State [of Ten-

nessee] for the maintenance and operation of hospitals aided under the Federal [Hospital Survey and Construction] Act * * *."

The minimum standards prescribed by the state of Tennessee under its own Hospital Survey and Construction Law included a provision that: " * * * The construction program shall provide, *in accordance with regulations prescribed under the federal act* [emphasis added here], for adequate health care facilities for the people residing in this state and insofar as possible shall provide for their distribution throughout the state in such manner as to make all types of health care reasonably accessible to all persons in the state." T.C.A. § 53–1206.

It also included a provision that, if the Tennessee commissioner of health " * * * finds that a project *application complies with the federal* and state *requirements* [emphases added here], and is otherwise in conformity with the state plan, he shall approve such application and shall recommend and forward it to the secretary [of health, education and welfare]." T.C.A. § 53–1208.

The Hospital's application in 1947 was approved, resulting in a loan of federal-assistance of $164,750 to the Hospital in June, 1948. That project was completed in June, 1950.

The Hospital applied a second time on July 19, 1966 to the federal Public Health Service of the Department of Health, Education and Welfare (HEW) for additional federal-assistance with a construction project. That second application was approved in August, 1966 for $553,498, and this second project was completed in May, 1970. The Hospital has been granted no further such assistance since the latter date and received from no agency any installment payments on either of its two applications after 1970.

As to the Hospital's 1947 application, the Surgeon General had the following authority, in part, to promulgate implementing regulations:

\* \* \* \* \* \* \* \*

Within six months after the enactment of this title, the Surgeon General * * * shall by general regulation prescribe * * [t]hat the State plan shall provide for adequate hospital facilities for the people residing in a State, without discrimination on account of race, creed, or color * * *. Such regulation may require that before approval of any application for a hospital or addition to a hospital is recommended by a State agency, assurance shall be received by the State from the applicant that (1) such hospital or addition to a hospital will be made available to all persons residing in the territorial area of the applicant, without discrimination on account of race, creed, or color * * *.

Pub.L. no. 79–725, 60 Stat. 1040 (1946), codified as 42 U.S.C. § 291e(f), prior to its amendment in 1964. It is noted that the thrust of the regulations to which there was reference in the foundation statute was the proscription of discrimination on account of race, creed or color.

The regulations promulgated by the Surgeon General, in furtherance of that statute, reflected the concern of the Congress that hospitals which received the assistance offered not discriminate in their admission policies on bases of race, creed or color.[1] The original regulations promulgated restated essentially the language of the statute with these words:

* * * The State plan shall provide for adequate hospital facilities for the people residing in a State without discrimination on account of race, creed, or color * * *.

*     *     *     *     *     *

* * * Before a construction application is recommended by a State Agency for approval, the State Agency shall obtain assurance from the applicant that the facilities to be built with aid under the act will be made available without discrimination on account of race, creed, or color to all persons residing in the area to be served by that hospital. * * *

12 Fed.Reg. 6874, 6876 (October 22, 1947), codified as 42 U.S.C. § 53.61, § 53.62.

In accordance with the foregoing regulation, the Hospital, concomitantly with its 1947 application for federal funds, gave to the Tennessee agency implicated its " * * * assurance that the facility will be operated without discrimination because of race, creed or color. * * * " Additionally, some 11 assurances were given by the Hospital in that application, none of which related to any pledge that it would make its facilities (or portions thereof assisted) available to all persons residing in the territorial area which it served. That written application is devoid of any language along those lines, and nothing before this Court is suggestive even remotely that such an assurance was given in some diverse manner.

By amendment of 1964, the Congress deleted from the predicate-statute the words, without discrimination on account of race, creed, or color. Pub.L. no. 88–443, 78 Stat. 447 (1964), codified as 42 U.S.C. § 291c(e). In lieu thereof, it " * * * authorized the

---

1. The history of this legislation reflects that the Congress was concerned " * * * that federal funds might be used for construction of hospitals with racially discriminatory admissions practices, a concern no doubt grounded in the fact that segregation was, in 1945, a de jure practice in some regions of the country and a de facto state of affairs generally. * * * " *American Hospital Ass'n. v. Harris*, C.A. 7th (1980), 625 F.2d 1328, 1335. Thus, as Judge Pell stated,

* * * the clear language of the statute in the case of the first assurance now referred to as the community service assurance, seems to me to lead to the inescapable conclusion that it was included in response to the concern expressed by Dr. Mott during the Senate Hearings that recipients might divert the funds to "restricted," *i.e.*, racially discriminatory, uses, rather than using the funds to construct facilities serving "all persons residing in the territorial area" as the statute required. The provision, with its "without discrimination on account of race, creed, or color" language, was, in short, simply a typical civil rights provision. Consistently, the sole original regulation promulgated in 1947 by the Surgeon General pursuant to this assurance was simply a restatement of the statutory language. * * * "

*American Hospital Ass'n. v. Harris, supra*, 625 F.2d at 1336 (Pell, J., concurring and dissenting opinion.)

administering agency to require an assurance that the assisted facility would be made 'available to all persons residing in the territorial area of the applicant.' * * *" *American Hospital Ass'n. v. Harris, supra,* 625 F.2d at 1336, n. 8.

■ Under the Act, as thus amended, the Surgeon General was then given the following authority, in part, to promulgate regulations implementing it:

\* \* \* \* \* \*

The Surgeon General * * * shall by general regulations prescribe * * * that the State plan shall provide for adequate hospitals, and other facilities for which aid under this part is available, for all persons residing in the State * * *. Such regulations may also require that before approval of an application for a project is recommended by a State agency to the Surgeon General for approval under this part, assurance shall be received by the State from the applicant that (1) the facility or portion thereof to be constructed or modernized will be made available to all persons residing in the territorial area of the applicant * * *.

Pub.L. no. 88–443, 78 Stat. 447 (1964), codified as 42 U.S.C. § 291c(e).

The authority thereby granted for the promulgation of new regulations was not exercised by the Surgeon General until 1972 and 1974. However, by the time the Hospital again applied in 1966 for additional federal funds, there had been certain changes made in the then existing regulations. At the time of its second application for assistance, the pertinent regulations provided, *inter alia,* that:

\* \* \* \* \* \*

Before an application for the construction of a hospital or medical facility is recommended by a State agency for approval, the State agency shall obtain assurances from the applicant that:

(a) The facility will furnish a community service;

\* \* \* \* \* \*

(c) All portions and services of the entire facility for the construction of which, or in connection with which, aid under the Federal Act is sought, will be made available without discrimination on account of creed; and no professionally qualified person will be discriminated against on account of creed with respect to the privilege of professional practice in the facility.

\* \* \* \* \* \*

29 Fed.Reg. 18447, 18449 (December 29, 1964), codified as 42 U.S.C. § 53.111.

The term, community-service, was defined thusly therein:

\* \* \* \* \* \*

* * * A facility provides a community service when (1) the services furnished are available to the general public, or (2) admission is limited only on the basis of age, medical indigency, or type or kind of medical or mental disability; or (3) the facility constitutes a medical or nursing care unit of a home or other institution which home or other institution is available in accordance with subparagraph (1) or (2) of this paragraph.

\* \* \* \* \* \*

*Ibid.,* at 18449, codified subsequently as 42 C.F.R. § 53.1.

These regulations made no mention whatever of any assurance that a hospital receiving assistance would make its facilities available to *all* persons residing in the territorial area it served. Thus, the Hospital gave no, and was not required to give any, such an assurance in 1966.[2]

Instead, insofar as is pertinent herein, the Hospital gave assurances only that it would furnish a "community-service," as defined by the aforequoted regulation; that all portions and services of its assisted facility

---

2. This is true, despite the fact that some 19 assurances were given and spelled-out in the application. Had the state agency required the Hospital to have given an assurance that it would make its assisted facilities available to *all* persons residing in the territorial area it served, it would then have been a simple matter to have included that language in the application. This, however, was not done.

would be made available, without any discrimination predicated upon creed; that no professionally-qualified person would be discriminated against on account of creed respecting the privilege of professional practice within the facility; and, that it would comply with the provisions of the Civil Rights Act of 1964, Title VI, and regulations issued pursuant thereto.[3]

Mrs. Lane claims she had a right to the obstetrical-services offered by the Hospital, and that such right was secured to her by the laws of the United States. She claims in addition that, when the Hospital refused to provide her such services, it, while acting under color of Tennessee law, deprived her of that right, thereby entitling her to recover damages therefor. *See* 42 U.S.C. § 1983.

■ The federal-right, of which Mrs. Lane claims she was deprived, does not arise from any of the *foregoing* regulations, in effect *at* the times the Hospital applied for federal-assistance. Instead, Mrs. Lane asserts a claimed right to hospital-services arising from certain regulations which became effective on September 1, 1979. *See* 42 C.F.R. §§ 124.603(a), (d)(1).[4] Assuming the 1979 regulations *could* be applied retroactively, so as to impose upon the Hospital obligations far in excess of those contemplated at the times it entered into its contractual-relationships with the state,[5] those

---

3. These assurances read as follows:

"* * * That the facility will furnish a community service * * *.

\* \* \* \* \* \*

"* * * That all portions and services of the entire facility for the construction of which, or in connection with which, aid is sought, will be made available without discrimination on account of creed, and no professionally qualified person will be discriminated against on account of creed with respect to the privilege of professional practice in the facility.

\* \* \* \* \* \*

"* * * That it will comply with Title VI of the Civil Rights Act of 1964 (P.L. 88–352) and all requirements imposed by or pursuant to the Regulations of the Department of Health, Education, and Welfare (45 CFR Part 80) issued pursuant to that title, to the end, that in accordance with Title VI of that Act and the Regulations, no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity for which the Applicant receives Federal financial assistance from the Department * * *."

4. Originally, the plaintiff had claimed that the Hospital violated the provisions of 42 C.F.R. §§ 124.603(a), 124.603(b)(1), 124.603(b)(2), 124.603(d)(1), 124.604. *See* II(a) of the pretrial order herein of July 16, 1981. Only §§ 124.-603(a), (d)(1), appear to have any possible relevance to the facts herein as developed at trial. Under those regulations:

"(a) *General.* (1) In order to comply with its community service assurances, a facility shall make the services provided in the facility or portion thereof constructed, modernized, or converted with Federal assistance under Title VI * * * of the Act available to all persons residing * * * in the facility's service area without discrimination on the ground of race, color, national origin, creed, or any other ground unrelated to an individual's need for the service or the availability of the needed service in the facility. * * *

\* \* \* \* \* \*

"(d) *Exclusionary admissions policies.* A facility is out of compliance with its community service assurance if it uses an admission policy that has the effect of excluding persons on a ground other than those permitted under paragraph (a) of this section. Illustrative applications of this requirement are described in the following paragraph [ ]:

* * * A facility has a policy or practice of admitting only those patients who are referred by physicians with staff privileges at the facility. If this policy or practice has the effect of excluding persons who reside * * * in the community from the facility because they do not have a private family doctor with staff privileges at the facility, the facility would not be in compliance with its assurance. The facility is not required to abolish its staff physician admissions policy as a usual method of admission. However, to be in compliance with its community service assurance it must make alternative arrangements to assist area residents who would otherwise be unable to gain admission to obtain services available in the facility. * * * " 42 C.F.R. § 124.603(a), (d)(1).

5. The defendants contend that to apply these 1979 regulations to it would be unconstitutional, as impairing the obligation of the existing contracts involved. Constitution, art. I, § 10; *see American Hospital Ass'n. v. Harris, supra,* 625 F.2d at 1332–1334 (Pell, J., concurring and dissenting opinion); Note, *Due Process for Hill-Burton Assisted Facilities,* 32 Vand.L.Rev. 1469 (1979).

This Court does not reach that constitutional question. "* * * [A] federal court should not

regulations simply are inapposite to the peculiar factual situation herein.

Those regulations are applicable only to a recipient of federal assistance " * * * that *has given* [emphasis added here] an assurance that it would make the facility or portion thereof assisted available to all persons residing * * * in the territorial area it serves. * * * " 42 C.F.R. § 124.601.[6] The Hospital, however, never gave such an assurance. That being so, §§ 124.603(a), (d)(1), *supra*, did not apply to the defendant and, as a result, it could not have violated the provisions thereof in its dealings with Mrs. Lane.

This Court considers the facts as they *are* herein, without pausing to speculate on the contrary result which *might* have been reached judicially *if* the Hospital, indeed, *had* given its assurance that it would make the use of its facilities and services available to *all* persons within the territorial area it served; those suppositions carry with them absolutely no legal significance herein. " * * * Courts deal with cases on the basis of facts disclosed, never with nonexistent and assumed circumstances. * * " *The Associated Press v. National Lab. Rel. Bd.* (1937), 301 U.S. 103, 132, 57 S.Ct. 650, 655, 81 L.Ed. 953, 960 (headnote 3).

The disclosed fact herein being, that the Hospital never gave any such assurance, the regulations upon which the plaintiffs' claim rests, 42 C.F.R. §§ 124.603(a), (d)(1), *supra*, were inapplicable to the Hospital. Accordingly, any failure of the Hospital to follow the provisions of those regulations did not deprive Mrs. Lane of any right secured her by the laws of the United States. *See* 42 U.S.C. § 1983, *supra*.

The Court recognizes that the regulation in effect at the time, in 1947, of the Hospital's first application, 12 Fed.Reg. 6876, *su-*

pra, required specifically that the appropriate state agency " * * * shall obtain assurance from the applicant that the facilities to be built with aid under this act will be made available without discrimination on account of race, creed, or color *to all persons residing in the area to be served by that hospital.* * * * " (Emphasis added.) Thus, *arguendo*, the state agency, handling the Hospital's application in 1947 for federal-assistance, might be said to have been required then to cause the Hospital to give an assurance which included the language emphasized immediately hereinabove in lieu of merely the anti-discrimination language which it required of the Hospital. Even under such an interpretation as that, the Hospital was not obligated to give any such former assurance to the state-agency involved.

The applicability of the 1979 regulations, upon which the plaintiffs' claim herein is now based, is dependent upon the nature of the assurance actually given by the assisted hospital, rather than upon the nature of any assurance which *should* have been, but which was not, required by the state-agency. *See* 42 C.F.R. 124.601. That 1947 regulation, the same as those promulgated subsequently, concerning the giving of assurances, was directed to the state-agency, not to the Hospital; if the state-agency acted improperly, by not requiring the Hospital to give such assurance, that agency, and not the Hospital, is to be faulted.

█ In her posttrial brief, the plaintiff asserts that her claim herein " * * * is based, not on a 1979 regulation, but upon the Hill-Burton Act itself. 42 U.S.C. § 291c(e). * * * " The plaintiff appears to overlook, however, that 42 U.S.C. § 291c(e), *supra*, is mere enabling-legislation, and not a congressional mandate directed to the

---

decide federal constitutional questions where a dispositive nonconstitutional ground is available. * * * " *Hagans v. Lavine* (1974), 415 U.S. 528, 547, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577, 594[16]. A dispositive nonconstitutional ground is available herein.

**6.** "The provisions of this subpart apply to any recipient of Federal assistance under Title VI * * * of the Public Health Service Act that has given an assurance that it would make the facility or portion thereof assisted available to all persons residing * * * in the territorial area it serves. * * * " 42 C.F.R. § 124.601.

Hospital.[7] That statute does not require federally-assisted hospitals to make their facilities available to all persons in their territorial area, nor does it require them to give an assurance to that effect, prior to receiving federal funding.

On the contrary, the statute authorizes the promulgation of regulations requiring, that before approval of an application for a project is recommended by a state-agency, assurance shall be received by the state from the applicant, that such facility will be made available to all persons residing in its territorial area.

Such statute, standing alone, provides the plaintiff no assistance in her claim against the Hospital. It " * * * is not complete by itself, since it merely declares the range of its operation and leaves to its progeny the means to be utilized in the effectuation of its command. * * * " *United States v. Mersky* (1960), 361 U.S. 431, 437, 80 S.Ct. 459, 463, 4 L.Ed.2d 423, 429 (headnote 6).

■ Once promulgated, the regulations " * * * have the force of law * * * just as if all the details had been incorporated into the congressional language. The result is that neither the statute nor the regulations are complete without the other, and only together do they have any force. In effect, therefore, the construction of one necessarily involves the construction of the other. * * * " *Idem.*

For the foregoing reasons,[8] the plaintiffs' attempted use of the new regulations, as a vehicle to claim a deprivation of Mrs.

Lane's right under federal law, is impermissible. She, not having shown she *had* a right secured to her by the Constitution or laws of the United States, of which she was deprived by the defendants, cannot prevail herein. (This disposition renders all other issues moot.)

It is the decision of this Court, therefore, that the plaintiffs hereby are

DENIED all relief. Rule 58(1), Federal Rules of Civil Procedure.

---

7. Under the plain language of 42 U.S.C. § 291c(e), *supra*, the Surgeon General " * * * was authorized, but not required, to require assurances from any hospital which sought Hill-Burton funds that it would be available to all persons in the territorial area * * *." *Newsom v. Vanderbilt University*, C.A.6th (1981), 653 F.2d 1100, 1105.

  42 U.S.C. § 300s, which, in the pretrial order herein was the plaintiffs' claim violated by the Hospital, likewise is mere enabling legislation.

8. For whatever edification of the Bench and Bar it may provide, it is added that the delay of the Court in the resolution of the issues herein was caused by the Court's concept, at the outset of the period of its advisement, that disposition herein could be on the basis of common-

law principles relating to contract-law. It was not until the receipt of an addendum this month to the supplemental brief of the plaintiffs that this Court became aware that its intended-approach hereto had been rejected. *Cf. Austin Welfare Rights Organization, et al. v. St. David's Community Hospital, et al.*, civil action no. A–78–CA–63, in the District Court for the Western District of Texas (per Roberts, J.)

  In the interest of judicial uniformity in a complex area of determinations, this Court opted to reconsider its initial approach and take its present course for whatever guidance the large number of health-care institutions, receiving funds under the Hill-Burton Act, *supra*, may derive from this judicial work-product.