**AMERICAN HOSPITAL ASSOCIATION, Plaintiff-Appellant,**

v.

**Patricia R. HARRIS, Secretary of the United States Department of Health, Education, and Welfare et al., Defendants-Appellees,**

**Illinois Migrant Council et al., Intervening Defendants.**

**No. 79–2162.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1980.

Decided July 2, 1980.

Pell, Circuit Judge, filed an opinion concurring in part and dissenting in part.

Lawrence A. Manson, Jay H. Hedgepeth, American Hospital Ass'n, Chicago, Ill., for plaintiff-appellant.

Shalom Brilliant, Dept. of Justice, Washington, D. C., for defendants-appellees.

Nelson A. Soltman, Legal Asst. Foundation of Chicago, Chicago, Ill., for intervening defendants.

Before PELL, Circuit Judge, PECK, Senior Circuit Judge,[*] and WOOD,. Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

The sole issue on appeal is whether the district court, 477 F.Supp. 665, properly refused to grant a preliminary injunction against the operation of regulations promulgated by the Department of Health, Education and Welfare.

Congress, in 1946, enacted Title VI of the Public Health Service Act, 42 U.S.C. § 291 *et seq.* (1976) (the Hill-Burton Act), to assist states in constructing and modernizing public hospitals, and to stimulate development of and research about new medical facili-

---

[*] Senior Circuit Judge John W. Peck of the United States Court of Appeals for the Sixth Circuit is sitting by designation.

ties. *Id.* § 291. Title VI made federal funds available for these purposes. As a condition for receiving federal money, the recipient had to assure that it would provide "a reasonable volume of services to persons unable to pay therefor" (charity care) and that the facility or the portion modernized would "be made available to all persons residing in the territorial area of the applicant . . . " (community service). *Id.* § 291c(e). In 1972, partly in response to suits brought alleging inadequate compliance with the "charity care" and "community service" assurances, HEW promulgated regulations. 42 C.F.R. §§ 53.-111 and 53.113 (1978). These regulations defined "reasonable volume" and "persons unable to pay," and established a standard for compliance with the community service requirement.

Funding for Title VI was discontinued in 1974. 43 Fed.Reg. 49,954 (Oct. 25, 1978). In 1975, to provide for new programs of federal loans, loan guarantees, and grants for the improvement of medical facilities, Congress enacted Title XVI to replace the program of assistance under Title VI. 42 U.S.C. §§ 300*o et seq.* (1976). Title XVI continued to require the same two basic assurances from grant and loan recipients that were contained in Title VI, namely, the charity care and community service obligations. *Id.* § 300*o*–3(b)(1)(J).

In 1979, HEW promulgated new regulations. 42 C.F.R. § 124, Subparts F and G. The new regulations, promulgated pursuant to explicit authority to issue regulations contained in Titles VI and XVI, purport to improve the effectiveness of the charity care and community service assurances contained in the statutory sections. The regulations, which became effective September 1, 1979, apply to hospitals which have already received federal assistance and have already made assurances, and expand the nature and scope of these hospitals' obligations for the future. Among other changes the new regulations increased the length of

time of the obligation to provide uncompensated services, provide for uniform patient eligibility requirements based only on income, make it more difficult to comply with the charity care assurance by eliminating the "open door" provision of the old regulations,[1] require that a failure to comply with the charity care assurance in one year will result in the amount of the deficit being added to the compliance level for future years, and expand the community service obligation by specifying that a recipient of federal funds may not deny admission on any grounds unrelated to the need for hospital services.

The plaintiff, the American Hospital Association (AHA), acting on behalf of its member organizations, brought suit in the district court seeking to have the new regulations preliminarily enjoined. In an order dated October 1, 1979, Judge Bua refused to grant a preliminary injunction finding that the AHA had not shown that its member organizations would suffer irreparable harm, that the AHA had not demonstrated a reasonable likelihood of success on the merits, and that the balance of hardships favored the denial of a preliminary injunction. The AHA appealed that decision to this court. We affirm.

. The purpose of a preliminary injunction is to preserve the status quo pending a final hearing on the merits. *Morgan v. Fletcher*, 518 F.2d 236, 239 (5th Cir. 1975). The decision to grant or deny injunctive relief is addressed to the sound discretion of the trial court and appellate review of that decision is very limited. *Kolz v. Board of Education of City of Chicago*, 576 F.2d 747, 748 (7th Cir. 1978) (per curiam); *Banks v. Trainor*, 525 F.2d 837, 841 (7th Cir. 1975) *cert. denied*, 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *American Medical Association v. Weinberger*, 522 F.2d 921, 924 (7th Cir. 1975). The discretion of the district court is not totally

---

1. Under the old regulations a recipient of federal funds was in compliance with the charity care assurance if it certified that it would not exclude any person from admission because

the person was unable to pay. 42 C.F.R. § 53.111(d)(2). The new regulations eliminate this "open door" option.

unrestrained, however, but must be exercised in the context of balancing the four prerequisites for injunctive relief: "a reasonable probability of success on the merits, irreparable injury, the lack of serious adverse effects on others, and sufficient public interest." *Kolz*, 576 F.2d at 478. While no one factor is determinative, "if a court finds that under applicable law there is no probability of success on the merits and no irreparable injury, it is unnecessary for the court to consider the other factors." 576 F.2d at 749.

The AHA asserts that the trial court erred in finding that AHA would not suffer irreparable harm pending a full hearing on the merits. Specifically, the AHA argues that the charity care and community service provisions of the new regulations may force member hospitals to rearrange its medical staffs and organizational policies, will cause the abandonment of hospitals' sound fiscal policies, will result in a loss of revenues to the hospitals, will limit allowable credit, and that the administrative costs of compliance with the regulations will be high.

We find that the district court did not abuse its discretion in deciding that the AHA's member organizations would not suffer irreparable harm pending a final hearing on the merits. We note first that to constitute irreparable harm "the threatened injury must be, in some way, 'peculiar.'" *A. O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Morgan v. Fletcher*, 518 F.2d at 240 (quoting *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921, 925 (D. C. Cir. 1958)). Only harm that the district court cannot remedy following a final determination on the merits may constitute irreparable harm. *A. O. Smith*, 530 F.2d at 527. In addition, injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm. *Id.*

Here, as the district court noted, many of the complained of costs should already have been incurred prior to the hearing on the preliminary injunction if the member hospitals hoped to be in compliance with the regulations by September 1, 1979, the day the regulations became effective. In addition, the district court properly concluded that some of the complained of harm to the AHA could be remedied by the court should the AHA succeed at the final hearing on the merits. We further believe that the district court acted within its discretion in concluding that any remaining injury was unduly speculative or too insubstantial to constitute threatened irreparable harm. The district court properly considered the claimed injuries to the AHA and its member hospitals and did not abuse its discretion by finding that the claimed injuries did not amount to a showing of irreparable harm.

The district court also concluded that the AHA had not exhibited a reasonable likelihood of success on the merits. The required showing of probability of success on the merits "varies with the quality and quantum of harm that [the moving party] will suffer from the denial of an injunction. '[W]here it appears that a lack of showing of irreparable damage * * * exists . . . the party seeking a preliminary injunction has a burden of convincing with a reasonable certainty that it must succeed at [the] final hearing.'" *District 50, United Mine Workers of America v. International Union, United Mine Workers of America*, 412 F.2d 165, 168 (D. C. Cir. 1969) (quoting *Dino de Laurentiis Cinematografica v. D-150, Inc.*, 366 F.2d 373, 375 (2d Cir. 1966)).

The AHA claims that the new regulations exceed the statutory authority delegated to HEW, are in certain respects inconsistent with expressed congressional intent, unlawfully alter the contractual rights of Hill-Burton hospitals, and conflict with the Medicare conditions of participation. We have reviewed the arguments of the parties and have decided that the district court was within its discretion in concluding that the AHA had not established with reasonable certainty that it would eventually prevail.

The record, following only a hearing on the preliminary injunction, is abbreviated. Both parties presented extensive argument on the statutory language and legislative history. The district court considered the appropriate legal issues. While we do not intend to prejudge the merits of the AHA's case, our review of the record, as presented so far, does not establish that the district court abused its discretion in finding that the AHA had not shown, with a reasonable certainty, that it would prevail on the merits.[2]

Accordingly, we affirm the denial of the preliminary injunction.[3]

AFFIRMED.

PELL, Circuit Judge, concurring in part and dissenting in part.

Although the issue presented by this appeal might be thought to be a narrow one, I do not agree that the district court properly exercised its discretion in denying preliminary injunctive relief to the AHA with respect to certain of the challenged regulations. The standard for such relief is not disputed. A party seeking preliminary injunctive relief must carry the burden of persuasion on the following four prerequisites: (1) there must be a reasonable likelihood that the plaintiff will succeed on the merits; (2) the plaintiff must have no adequate remedy at law and must show that it will be irreparably harmed if the injunction is not issued; (3) the threatened harm to the plaintiff must outweigh the probable harm the injunction will inflict on the defendant; and (4) the granting of the injunc-

tion must not disserve the public interest. *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976).

While the majority opinion acknowledges that the purpose of a preliminary injunction is to maintain the status quo pending the outcome of the litigation, it appears not to acknowledge the correlative principle that a stronger case for preliminary relief is presented where, as here, that is the precise objective that the injunction will further. *See, e. g., Banks v. Trainor*, 525 F.2d 837, 841 (7th Cir. 1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *District 50, United Mine Workers of America v. International Union, United Mine Workers of America*, 412 F.2d 165, 168 (D.C. Cir. 1969); *cf. South East Chicago Commission v. Department of Housing and Urban Development*, 488 F.2d 1119, 1127 (7th Cir. 1973) (purpose of preliminary injunction is to maintain the status quo pending final judgment; party who fails to seek preliminary relief may therefore not complain of activities of opposing party after suit filed).

Because the status quo is considered to be the last *uncontested* status, which preceded the lawsuit, *Westinghouse Electric Corp. v. Free Sewing Machine Co.*, 256 F.2d 806, 808 (7th Cir. 1958), that status for the purposes of this litigation is the regulatory situation which existed prior to the effective date of the challenged regulations. Bearing these principles in mind, the question before this court, then, is whether the AHA carried its burden with respect to each of the standard requirements for the requested relief.

2. The district court also ruled that to grant a preliminary injunction would impose on poor individuals needing hospital care "a hardship that is far greater than any the AHA's member organizations will have to endure." Because we have concluded that the district court did not abuse its discretion in finding that the AHA member organizations had *not* established a threat of irreparable harm and had not shown a probability of success on the merits, we need not consider the district court's conclusion on the balance of hardships.

3. In dissent Judge Pell provides an exhaustive analysis of plaintiff's likelihood of success upon the merits, one of the four prerequisites to be

met by the plaintiff to justify a preliminary injunction. Even though on the abbreviated record before us we are not prepared to adopt his views, Judge Pell's dissent may serve as a helpful brief for consideration of the trial judge upon the full trial of the case. For our present purposes, we note on the other hand that one of the other essential prerequisites, irreparable harm, is lightly treated in the dissent. Remembering that our standard of review is one of "abuse of discretion," we decline to set aside the findings of the trial judge by speculating on some possible harm to plaintiff which a damage award would *not cure* in the event plaintiff ultimately prevails.

## I.

### Likelihood of Success on the Merits

An analysis of whether AHA is likely to prevail on the merits in this action [1] would seem necessarily to involve first an examination of the nature and extent of the obligations assumed by the facilities in question at the time of their decision to obtain Hill-Burton funding, secondly, a determination of the scope of the Secretary's power to define that obligation in light of the relevant statutory provisions, and, finally, a determination as to whether the 1979 regulations challenged here are within the ambit of that authority.

### A. Evolution of the Assurances

The Hospital Survey and Construction Act of 1946, Pub. L. No. 79–725, 60 Stat. 1040 (1946) (current version at 42 U.S.C. §§ 291–291*l* (1976 & Supp. II 1978)), commonly known as the Hill-Burton Act, was enacted as a result of a message sent to Congress by President Truman on November 19, 1945, in which the President urged the passage of legislation which would ensure adequate health care for all. *See* President Truman's Message to Congress on Health Legislation, [1945] U.S. Code Cong. & Admin. News, p. 1143.[2] The message detailed five programs thought by President Truman to be necessary to achieve this goal: (1) construction of hospitals and related facilities; (2) expansion of public health, maternal, and child health services; (3) programs which would encourage medical education and research; (4) prepayment of medical costs in order to assure access to necessary medical and hospital services; and (5) protection against wage loss resulting from sickness or disability.

An examination of the express language of the original statute demonstrates that the Hill-Burton Act was addressed primarily to the *first* of these five factors, *i. e.*, to the construction of facilities rather than the provision of services.[3] The purpose of the Act, as set forth expressly in the statute was merely

. . . to assist the several States—
(a) to inventory their existing hospitals . . . to survey the need for construction of hospitals, and to develop programs for construction of such public and other nonprofit hospitals as will, in conjunction with existing facilities, afford the necessary physical facilities for furnishing adequate hospital, clinic, and similar services to all their people; and
(b) to construct public and other nonprofit hospitals in accordance with such programs.

Pub. L. No. 79–725, § 601, 60 Stat. 1040 (1946).[4] In order to effectuate the stated

---

1. It should be noted that the test in this circuit for preliminary relief is *likelihood* of success on the merits, not a "reasonable certainty" of success as both the majority and the district court opinion seem to indicate. *Compare Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976) *with District 50, United Mine Workers of America v. International Union, United Mine Workers of America*, 412 F.2d 165, 168 (D.C. Cir. 1969).

2. The President's message was no doubt a response to the serious economic and geographic barriers to health services that had been highlighted during the depression and particularly during World War II when medical examinations conducted by the Selective Service System revealed alarmingly high disability percentages among inductees. *See* Rosenblatt, *Health Care Reform and Administrative Law: A Structural Approach*, 88 Yale L.J. 243, 264–65 (1978) (hereafter Rosenblatt).

3. It was not until 1965 with the passage of Medicare and Medicaid that legislation directed at providing low or no cost health care to those unable otherwise to afford it was enacted. *See* Social Security Amendments of 1965, Pub. L. No. 89–97, §§ 1801–1875, 79 Stat. 299 (1965) (Medicare) (current version as amended at 42 U.S.C. §§ 1395–1395rr (1976 & Supp. II 1978)) and *id.* at §§ 1901–1905, 79 Stat. 343 (Medicaid) (current version as amended at 42 U.S.C. §§ 1396–1396k (1976 & Supp. II 1978)).

4. Section 601 was amended in 1949, Act of Oct. 25, 1949, ch. 722, § 6, 63 Stat. 900–01 (1949), and again in 1954, Act of July 12, 1954, ch. 471, § 4(a), 68 Stat. 464 (1954). It was not until an amendment in 1964, however, that the phrase "physical facilities" was dropped from subsection (a) of the statutory declaration of purpose. Even the 1964 amendment, it should be noted, did not indicate a change in emphasis from the construction of facilities to the provision of services. Rather, it merely evidenced a new

goal, the Act provided for shared administration between federal and state agencies. The Surgeon General was empowered to issue regulations[5] specifying the terms under which state agencies could assume administrative responsibility for Hill-Burton funds, and the state agencies in turn were given authority to recommend approval or rejection of grant applications and to supervise participating facilities.

Additionally, the Surgeon General was authorized to issue regulations requiring that certain assurances, known as the uncompensated care and community service assurances, be given by the applicant to the state before the state recommended approval of the application. With respect to this latter provision, because the Surgeon General did in fact promulgate such regulations, and because it is this statutory provision which furnished the original basis for the regulations challenged here today, background discussion is necessary of how that authority to require assurances came to be included in the Act.

The draft bill which ultimately became the Hill-Burton Act contained no references to any community service or uncompensated care assurances which would be required of recipient facilities. *See* Proposed Amendments to the Public Health Services Act: Hearings on S. 191 Before the Senate Committee on Education and Labor 79th Cong., 1st Sess. 1–6 (1945) (hereinafter 1945 Hearings).[6] Rather, the bill was aimed purely at subsidizing construction of hospitals and health care facilities where needed. In his opening statement at the 1945 Hearings, Senator Lister Hill introduced the measure as a "first step" toward ensuring adequate health care for all through the mechanism of facilitating necessary construction. 1945 Hearings, *supra*, at 7. The "first step" language is consistent with the view that the Act was intended to be only a partial response to the needs detailed in President Truman's message. Similarly, Senator Pepper stated on numerous occasions during the hearings that the purpose of the bill was to serve as the *first step* of a medical program through the provision of facilities. The Senator's initial "first step" reference took place during the statement of Dr. Smelzer, then President of the AHA, and is particularly significant because it was expressed during colloquy over whether the bill should serve as a vehicle for the provision of services:

> The Chairman (Senator Murray): Could the administrator of this bill compel a State to see to it that all the people are going to get care in these hospitals, that they are going to be aided through the system?
>
> Dr. Smelzer: I think if this bill will provide the hospitals, will develop *programs for the construction of such public and nonprofit hospitals*, people who get into

---

emphasis in the program on modernization of existing structures as well as the construction of new ones. The 1964 declaration of purpose, which is still in effect, provides:

> The purpose of this subchapter is—
> (a) to assist the several States in the carrying out of their programs for the construction and modernization of such public or other nonprofit community hospitals and other medical facilities as may be necessary, in conjunction with existing facilities, to furnish adequate hospital, clinic or similar services to all their people;
> (b) to stimulate the development of new or improved types of physical facilities for medical, diagnostic, preventive, treatment, or rehabilitative services; and
> (c) to promote research, experiments, and demonstrations relating to the effective development and utilization of hospital, clinic, or similar services, facilities, and resources,

and to promote the coordination of such research, experiments, and demonstrations and the useful application of their results.
42 U.S.C. § 291 (1976).

**5.** Both the original Act and the 1964 general amendments, Pub. L. No. 88–443, 78 Stat. 447 (1964), assigned federal administrative responsibility to the Surgeon General of the United States Public Health Service. The functions of the Surgeon General were transferred to the Secretary of HEW by § 1(a) Reorganization Plan No. 3 of 1966. For the complete text of the plan see the notes following 42 U.S.C. § 202 (1976).

**6.** For an excellent review of the legislative history of Act, *see* Note, *Due Process for Hill-Burton Assisted Facilities*, 32 Vand.L.Rev. 1469 (1979).

them will be taken care of at the local level.

. . . . . .

Senator Pepper: You are leaving it to us to find, if we can, some proper way to aid the people, all the people in getting access to these hospital facilities and services, and this is considered as a first step and merely as a part of a whole program. *This bill, mainly, is to provide facilities.*
Dr. Smelzer: That is correct.

1945 Hearings, *supra*, at 30–31 (emphasis supplied). After the conclusion of Dr. Smelzer's testimony, the Senator again reiterated that while any comprehensive medical program would contain two parts, provision of facilities and provision of services to those who needed them, the bill under consideration dealt only with the first. *Id.* at 64–65.

The intervenors, however, dispute the "facility emphasis" reading of the legislative history and instead rely on a statement by Senator Ellender, quoted out of context, as support for the proposition that the principal focus of the Act was aimed at shifting the responsibility for the health care of indigents onto grant recipients. Senator Ellender's statement was made in response to the remarks of other senators during the testimony of Dr. Frederick D. Mott, Chief Medical Officer of the Farm Security Administration.

Dr. Mott, who is also quoted by the intervenors, suggested that the bill should contain some safeguards to ensure that recipients of federal funds carry out the legislative purpose of providing facilities for furnishing adequate medical services. Otherwise, he feared that the subsidized structures would be "diverted to some restricted use not contemplated at the time of approval of the project." *Id.* at 188–190. In response to this, Senator Taft suggested that perhaps facilities accepting aid should have an obligation to provide care for a specified number of indigent patients. Contrary to the interpretation advanced by the intervenors, *both Dr. Mott and Senator Pepper then expressed the view that such a requirement might overburden hospitals.* In

view of this response from Dr. Mott, it is more likely that his suggestion regarding "safeguards" was addressed to a fear that federal funds might be used for construction of hospitals with racially discriminatory admissions practices, a concern no doubt grounded in the fact that segregation was, in 1945, a de jure practice in some regions of the country and a de facto state of affairs generally. Senator Taft then replied, "I do not know whether it ought to be a requirement, although I expect you might modify that through health insurance, or something of that kind." *Id.* at 190. Senator Pepper again reiterated his view that the burden of caring for indigents should rest upon the public and not upon a particular facility. Senator Ellender concurred, and reasoned, in the statement relied on by intervenors, that if federal funds were available to subsidize construction, it would be easier for the local community involved to provide funding for indigent care:

If people in all localities were able to pay for hospitalization, there would be no need for this bill. It seems to me that our primary purpose should be to devise means to take care of those who cannot take care of themselves. *My reason for supporting a bill providing for Federal aid to build hospitals is to make it easy for the community in which a hospital may be built to give aid to the indigent.* Unless some method is provided whereby the indigents and those unable to pay for hospitalization can be taken care of, I would not be much interested in providing Federal funds to build hospitals in various parts of our nation.

*Id.* at 191 (emphasis supplied). Senator Pepper agreed, "That is the next problem we have got to devote ourselves to—is how to make these facilities available to the people." *Id.* Senator Taft concluded the discussion by observing, "my interest in [this bill] is like in a public works bill, just *to provide construction.* But beyond that, these facilities must be made available to the people." *Id.*

Clearly no fair reading of the above exchange supports the position advanced by

the intervenors that Congress intended for the Hill-Burton Act, standing alone, to impose broad indigent care obligations on participating hospitals. Neither does the language of the assurances themselves support such a proposition.

The assurances were added after the above hearings during executive sessions of a Senate subcommittee studying the legislation.[7]

While some conjecture as to the Congressional purpose often is necessary, the clear language of the statute in the case of the first assurance now referred to as the community service assurance, seems to me to lead to the inescapable conclusion that it was included in response to the concern expressed by Dr. Mott during the Senate Hearings that recipients might divert the funds to "restricted," i. e., racially discriminatory, uses, rather than using the funds to construct facilities serving "all persons residing in the territorial area" as the statute required. The provision, with its "without discrimination on account of race, creed, or color" language, was, in short, simply a typical civil rights provision.[8] Consistently, the sole original regulation promulgated in

1947 by the Surgeon General pursuant to this assurance was simply a restatement of the statutory language. *See* 42 C.F.R. § 53.111–.112 (1960).

The second provision, which required a participating hospital to assure that a reasonable volume of services would be made available to persons unable to pay, with the exception of situations where such a requirement was not financially feasible, likewise appears to be of a straightforward nature. While the Act was addressed primarily to the problem of providing adequate numbers of hospitals, several senators, as discussed previously, were concerned that facilities constructed with federal funds be made available to the people to the maximum extent practicable. This concern was no doubt heightened by the pragmatic possibility that "phase two" legislation directed toward providing health services to those in need might be somewhat more difficult to pass.[9] At the same time, however, the unanimous opinion during the Committee hearings was that it would be unduly burdensome to require a specified amount of indigent care, and a

---

**7.** No further mention of the assurances occurs in either the 1945 Hearings, the Senate Report, *see* S. Rep. No. 674, 79th Cong., 1st Sess. (1945), or the Report of the House Committee on Interstate and Foreign Commerce. The assurances, as they appeared in the original Act, are as follows:

Such regulation [of the Surgeon General] may require that before approval of any application for a hospital or addition to a hospital is recommended by a State agency, assurance shall be received by the State from the applicant that (1) such hospital or addition to a hospital will be made available to all persons residing in the territorial area of the applicant, without discrimination on account of race, creed, or color, but an exception shall be made in cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable provision on the basis of need for facilities and services of like quality for each such group; and (2) there will be made available in each such hospital or addition to a hospital a reasonable volume of services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial standpoint.

Pub. L. No. 79–725, § 622(f), 60 Stat. 1040 (1946).

**8.** The fact that the provision as enacted in 1946 contained a "separate but equal" clause is supportive of this conclusion. This clause was subsequently held unconstitutional in *Simkins v. Moses H. Cone Memorial Hospital*, 323 F.2d 959 (4th Cir. 1963), *cert. denied*, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). When Congress thereafter eliminated the clause, it also eliminated the words "without discrimination on account of race, creed, or color," Pub. L. No. 88–443, § 703(e), and instead authorized the administering agency to require an assurance that the assisted facility would be made "available to all persons residing in the territorial area of the applicant." *Id.*, (codified at 42 U.S.C. § 291c(e)). As one commentator has concluded, "The legislative intent behind this provision appeared to be acquiescence in the *Simkins* prohibition of racial discrimination without explicit statutory language reaching that result." Rosenblatt, *supra* note 2 at 266 n.80.

**9.** In fact, it took nineteen years to pass the Medicare and Medicaid programs. *See* note 3 *supra*.

further concern had been expressed that some hospitals, even with construction subsidies, might have insufficient funds for operations costs. *See* 1945 Hearings, *supra*, at 177–191.[10] Finally, the Committee was fully aware that many, if not most, hospitals already had voluntarily assumed substantial responsibility for charitable care. Senator Taft, for example, had openly pondered the possibility of imposing an absolute requirement for a quota of indigent care, but had simultaneously observed that "I imagine every hospital of a general nature would be lucky if they did not have 20 percent indigent patients." Thus, the most reasonable conclusion that can be drawn about the ultimate inclusion of the assurance is that it represented a limited compromise. Hospitals with the financial capability of providing charity care would be required to do so, and those that found it fiscally impracticable would not. Therefore, while the assurance should be given operative effect, it is simply not a fair reading of either the statute or the legislative history to view the uncompensated care provision as a mandatory social welfare program in and of itself. The statute, it will be recalled, specifically stated that, "an exception shall be made if such a requirement is not feasible from a financial viewpoint."

The 1947 regulations that were promulgated by the Surgeon General under the uncompensated care assurance were, as with the community service assurance, of an unambiguous nature. By way of example, the definition of what would constitute a reasonable volume of uncompensated care was as follows:

In determining what constitutes a reasonable volume of free patient care, there shall be considered conditions in the area to be served by the applicant, including the amount of free care that may be available otherwise than through the applicant.

42 C.F.R. § 53.113 (1960). The regulation further made provision for the statutory exception:

The requirement of assurance from the applicant may be waived if the applicant demonstrates to the satisfaction of the State Agency, subject to subsequent approval by the Surgeon General, that furnishing such free patient care is not feasible financially.

*Id.* Finally, the regulation specified criteria for determining persons unable to pay,[11] and detailed what sources of community funding could appropriately be utilized to meet the uncompensated care obligation.[12]

Because no new regulations were promulgated until the issuance of new uncompensated care regulations in 1972, 37 Fed.Reg. 14719 (1972),[13] it was the above statutory and regulatory framework which defined, as of the time of contracting the scope of a hospital's Hill-Burton obligation under the terms of its grant or loan agreement insofar as those facilities participating in the program between 1946 and 1972 are concerned. While the record is not sufficiently developed at this stage of the litigation to permit a determination of what percentage of AHA's membership received grants or loans during this time period, it appears

---

**10.** The Committee had, in any event, suggested at one point that consideration should be given to subsidizing the operating budgets of hospitals. Senator Murray, the Committee Chairman, had noted that one of the reasons for the hospital shortage was the fact that facilities had experienced a shortage of operating funds. *Id.* at 177–78.

**11.** " 'Persons unable to pay therefor' [include] both the legally indigent and persons who are otherwise self-supporting but are unable to pay the full cost of needed hospital care." *Id.*

**12.** "Such care may be paid for wholly or partly out of public funds or contributions of individuals and private and charitable organizations

such as community chests or may be contributed at the expense of the hospital itself." *Id.*

**13.** The regulation was issued in interim form on July 22, 1972, by HEW with a commitment in the preface to reconsider the matter within 90 days due to certain procedural questions which had been raised in the consideration of the regulation. The final regulation, with technical changes, was issued on June 22, 1974, 38 Fed.Reg. 16353 (1973). *See* Rose, *Federal Regulation of Services to the Poor Under the Hill-Burton Act; Realities and Pitfalls*, 70 Nw.U.L. Rev. 168, 175 n.46 (1975).

that the percentage is a substantial one. This follows from the fact that it is not disputed that significant funding has not been available under Title VI, the original Hill-Burton Act, since 1974.

Beginning in the late 1960's and into the early 1970's, several private plaintiffs and public interest groups filed suits against federally assisted hospitals, alleging refusal by the hospitals to comply with the terms of the Hill-Burton assurances. HEW was frequently joined as a defendant in these actions for its apparently complete failure as of that time to enforce the Act and the 1947 regulations. I do not disapprove in toto the current regulations, *see* discussion *infra*, and it is evident that much of this early litigation was unfortunately necessary in order to force assisted hospitals to provide even token charitable care. Even when the hospital did not claim to be within the statutory exception for financial impracticability, the facts as developed in these early cases indicated that some facilities, deplorably, maintained firm policies of refusing charity care, sometimes with tragic results. · *See* Comment, *Provision of Free Medical Services by Hill-Burton Hospitals*, 8 Harv. Civ.R.Civ.L.L.Rev. 351 n.4 (1973) (patients refused admission to Hill-Burton hospital due to inability to pay died thereafter).

In any event, one of the principles which emerged from this early period of litigation was that the transactions between the hospitals and the relevant administrative agencies were of a *contractual* nature.[14] For example, in *Euresti v. Stenner, supra,* Retired Justice Clark, sitting by designation, wrote for the court:

> The contract between [the hospital] and the State of Colorado explicitly incorporates the federal statutory obligation. In turn, the State's obligation to provide

assurances of compliance is the sine qua non for the furnishing of federal funds. Indeed, [the hospital's] obligation is set out specifically in the closing papers signed by the hospital, the State and federal authorities. Nothing could be clearer: In receiving federal funds, [the facility] obligated [itself] to dispense a reasonable amount of free hospital services to those unable to pay.

458 F.2d at 1118–19 (footnote omitted). *Accord Corum v. Beth Israel Medical Center,* 359 F.Supp. 909, 912 (S.D.N.Y.1973) (giving of uncompensated care assurance created a contractual relation intended to benefit those who could not pay).

Although none of these early cases resulted in a court order against HEW, the joinder of the agency no doubt induced in part the drafting of the 1972 uncompensated care regulations, which attempted to define more specifically what would constitute compliance with that obligation. The level of free service which, under the 1972 regulation, constituted "presumptive compliance" was an amount equivalent to the lesser of three percent of the facility's operating costs, or ten percent of all federal assistance provided to the facility under the Act, excluding that received under supplemental programs. Alternatively, a facility could certify that it would turn away no one who sought free care, a course which became known as the "open door" option. *See* 42 C.F.R. § 53.111(d) (1975). With respect to those facilities not electing the open door option, the failure of a facility to attain a compliance level in one year did not result in a deficit being carried over, but rather in a requirement that the facility prepare a statement justifying the failure and describing what steps would be taken to assure compliance in the future. *Id.* at

---

14. A second issue which was addressed in most of these cases was whether a private right of action should be implied under the Act. The vast majority of courts answered in the affirmative. *See Saine v. Hospital Authority of Hall County,* 502 F.2d 1033, 1034–35 (5th Cir. 1974); *Euresti v. Stenner,* 458 F.2d 1115, 1118 (10th Cir. 1972); *Corum v. Beth Israel Medical Center,* 359 F.Supp. 909, 914–15 (S.D.N.Y.1973) (also holding that corporate plaintiffs, neigh-

borhood organizations alleging injury to their members, have standing to enforce the Act); *Organized Migrants in Community Action, Inc. v. James Archer Smith Hospital,* 325 F.Supp. 268, 271 (S.D.Fla.1971); *Cook v. Ochsner Foundation Hospital,* 319 F.Supp. 603, 606 (E.D.La.1970). *Contra Stanturf v. Sipes,* 224 F.Supp. 883, 890 (W.D.Mo.1963), *aff'd,* 335 F.2d 224 (8th Cir. 1964), *cert. denied,* 379 U.S. 977, 85 S.Ct. 676, 13 L.Ed.2d 567 (1965).

§ 53.111(e)(2). A durational limit of twenty years was also established for the uncompensated care commitment.[15]

The community service obligation thereafter also became the subject of regulatory action, this time as a direct result of litigation. In *Cook v. Ochsner Foundation Hospital*, 61 F.R.D. 354 (E.D.La.1972), the court held that the Secretary had violated his obligation to enforce the Act by not requiring Hill-Burton facilities in New Orleans to participate in the Medicaid program. Noting that Medicaid participants constituted eleven percent of the metropolitan population, the court reasoned that their exclusion from Hill-Burton facilities was a form of "discrimination" in violation of the express terms of the Act and the grant assurances. *Id.* at 356 n.1. Thereafter, HEW amended the community service regulation to provide:

> In order to comply with its community service assurance an applicant must: . . . make arrangements, if eligible to do so, for reimbursement for services with: (A) Those principal State and local governmental third-party payors which provide reimbursement for services that is not less than the actual cost of such services as determined in accordance with accepted cost accounting principles; and (B) Those Federal governmental third-party programs, such as Medicare and Medicaid, to the extent that the applicant is entitled to reimbursement at reasonable cost under a formula established in accordance with applicable Federal law.

42 C.F.R. § 53.113(d)(2) (1976). As with the uncompensated care assurance, a twenty year durational limit was established for the community service obligation, but was later struck down in an unreported order in *Cook v. Ochsner Foundation Hospital*, Civil No. 70–1969 (E.D. La., order filed March 13, 1975), and was subsequently removed from

the regulation. *See* 42 C.F.R. § 53.113(a) (1978). Finally, although a facility could not, in accordance with the regulation quoted above, refuse admission on the basis that reimbursement would have to be applied for through Medicare or Medicaid, hospitals were permitted under the new community service regulation to refuse admission based on age, medical indigency, or a type or kind of mental disability. *Id.* at § 53.113(d)(ii).[16]

The last regulatory action preceding the regulations at issue here was a modification of the uncompensated care regulations to comport with the judgment in *Corum v. Beth Israel Medical Center*, 373 F.Supp. 550 (S.D.N.Y.1974) to require a determination of eligibility for uncompensated care prior to the provision of services, except in cases of emergencies. 42 C.F.R. § 53.111(f)(1) (1978). Facilities were further required to place notices in prominent locations throughout the hospital regarding the availability of uncompensated services. *Id.* was § 53.111(i).

As the above discussion, necessarily lengthy, illustrates, the regulatory actions taken prior to the issuance of the 1979 regulations were primarily of a definitional nature and were well within the range permitted by the nature of the original contract between the assisted facilities and the government entities involved. None of the regulations had the effect of adding new obligations, not contemplated at the time of the original agreement to the performance obligations assumed by the hospitals.

It was at this juncture that funding ceased to be available under the original Hill-Burton Act (Title VI), and the supplemental program embodied in Title XVI was enacted. The AHA has contended, and the parties do not dispute, that Title XVI funds have *never been available* to AHA members.[17] In enacting Title XVI to replace

---

**15.** In *Newsome v. Vanderbilt University*, 453 F.Supp. 401, 413 (M.D.Tenn.1978), the court held that since precise records of opening dates were not kept, the date from which the twenty year period would run was that of the final funds approval.

**16.** *But see* discussion *supra* regarding obligations under the uncompensated care assurance.

**17.** The only Title XVI appropriations to date have, according to the briefs, been made pursuant to Part D, which provides for project grants to public hospitals for narrowly circumscribed

Title VI as a source of funds, Congress specified a more limited statutory purpose, with the emphasis being on modernization rather than new construction, except in areas where there had been "recent rapid population growth." 42 U.S.C. § 300*o* (1976). During the hearings on Title XVI, some attention was given to the fact that the record of adherence to the uncompensated care and community service assurances had been less than exemplary under Title VI. The Senate Committee Report, for example, observed that implementation of the uncompensated care assurance was in its infancy at the state and local level due to the fact that there were no monitoring programs in existence, and categorized enforcement generally as a "sorry performance." Senate Report 93–1285, 93rd Cong., 2nd Sess., reprinted in [1974] U.S.Code Cong. & Admin.News at 7900. The Congressional response to this state of affairs was to include in Title XVI "various provisions to strengthen efforts to enforce the assurances." *Id.* Among these provisions was 42 U.S.C. § 300p–2(c), transferring enforcement power under both Title XVI and Title VI from the state agencies to HEW, and § 300*o*–1, which not only authorized but required the Secretary to

> (6) prescribe the general manner in which each entity which receives financial assistance under this subchapter or has received financial assistance under subchapter IV of this chapter [Title VI] shall be required *to comply with the assurances required to be made at the time such assistance was received* and the means by which such entity shall be required to demonstrate compliance with such assurances.

> An entity subject to the requirements prescribed pursuant to paragraph (6) respecting compliance with assurances made in connection with receipt of financial assistance shall submit periodically to the Secretary data and information which reasonably support the entity's compli-

ance with such assurances. The Secretary may not waive the requirement of the preceding sentence.

*Id.* (emphasis supplied). Thus, in Title XVI, Congress clearly manifested an intent that the assurances, *made at the time that federal assistance was received,* should be given effect. Because the AHA's members received funding under Title VI only, the extent of their obligations must therefore be measured in terms of the assurances given at the time each facility entered into its contract with the federal and state governments.

The government and the intervenors, however, dispute the contractual characterization of the existing relation. HEW, for example, asserts that facilities which have already received funds have no contract because the Government's obligations are "fully executed." This in my view amounts to nothing more than an argument that the fact the Government's performance has been completed gives it the right unilaterally to alter the scope of the performance which may be demanded of the other contracting party, a position which represents, to say the least, a novel theory of contract law.[18]

Further, HEW and the intervenors contend that the passage of Title XVI somehow increased the scope of the Secretary's authority to impose more stringent forms of regulation on hospitals assisted under Title VI. While I agree that both the statutory language and the legislative history of Title XVI evidence a desire on the part of Congress that meaningful steps be taken to ensure that *all* facilities comply with the terms of whatever assurances were given at the time of the original grant or loan, I do not agree that the statute should be read to authorize an alteration of the original contract terms. To hold otherwise would be inconsistent with the 42 U.S.C.A. § 300*o*–1(6), quoted above.

purposes, *i. e.,* eliminating fire and safety hazards, or avoiding non-compliance with licensing or accreditation standards. *See* 42 U.S.C.A. § 300r(a) (Supp.1978).

**18.** Putting aside legal terminology, this is commonly referred to as changing the rules in the middle of the game.

Further, to hold that the statute authorizes the Government to enter into a contract and subsequently utilize its sovereign power, in this instance, through the promulgation of regulations, to exact a greater degree of performance from the private party than was contemplated in the original bargain, would violate not only established contract principles, but also the federal constitution. It is therefore a construction which should be avoided.

It is well established that parties contracting with a state are protected by the contract clause, U.S.Const., Art. I, § 10, from state attempts to utilize legislative authority to impair their contractual obligations. *See e. g., Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722–2723, 57 L.Ed.2d 727 (1978) (stating in dictum that legislative modifications of contracts to which the state is a party will be evaluated with particular scrutiny); *United States Trust Co. v. New Jersey*, 431 U.S. 1, 24, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977) (holding unconstitutional statute which authorized one party to assume greater risks, thereby permitting a diminution of pledged revenues and impairing other parties' contractual obligations); *E & E Hauling, Inc. v. Forest Preserve District of DuPage County*, 613 F.2d 675 (7th Cir. 1980). It is likewise well established that a party dealing with the federal government is similarly protected through the Fifth Amendment. In *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), Justice Brandeis, writing for the Court, examined the constitutional legitimacy of a Congressional attempt to repudiate, in the interest of easing the difficulties of dealing with the depression economy, all insurance policies issued under the War Risk Insurance Act during the World War I era. After concluding that the policies were contracts of the United States, the Court observed:

> The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a state or the United States. Rights against the

United States arising out of a contract with it are protected by the Fifth Amendment (citations omitted). When the United States enters into contractual relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals. *Id.* at 579, 54 S.Ct. at 843. Just as the Government is prohibited by the uncompensated taking clause of the Fifth Amendment from invoking its sovereign authority to rescind its own contractual obligations, it similarly is barred by the due process clause from utilizing that same sovereignty to demand, after the fact, a greater degree of performance from private parties contracting with it. *Cf. Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (while Fifth Amendment contains no explicit equal protection clause, federal government action in maintaining racially segregated school system held so unjustifiable as to be violative of the due process clause).

The recent case of *Larionoff v. United States*, 533 F.2d 1167, 1179–80 (D.C.Cir. 1976), *aff'd*, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) is illustrative. There, enlisted navy personnel contended that they were entitled to a "variable reenlistment bonus" equal to four times the "regular" reenlistment bonus due to their participation in certain specified programs. The programs were thereafter removed from the list of those eligible for the special bonus, an action which the Government claimed was taken pursuant to a subsequent change in the controlling statute. In holding the plaintiffs entitled to the bonus, the Court of Appeals emphasized:

> Since contractual rights against the government are property interests protected by the Fifth Amendment, Congressional power to abrogate existing governmental contracts is narrowly circumscribed. And although Congress may constitutionally impair existing contract rights in the exercise of a paramount governmental power such as the "War Powers," Congress is "without power *to reduce expenditures* by abrogating contractual obligations of the United States."

*Id.* (citations omitted). In affirming, the Supreme Court concluded, as I believe this court should today, that the Congressional enactment in question should not be read to permit the United States to ignore the terms of the original contract. As the Court observed, "if Congress had such an intent, serious constitutional questions would be presented." 431 U.S. at 879, 97 S.Ct. at 2159.

Turning finally to the regulations in issue, while I am reluctant to prejudge the merits of this litigation, it seems patent to me that certain of the regulations are not within the scope of the Secretary's authority by virtue of the fact that they impose obligations on the facilities far in excess of those agreed to at the time of contracting. With respect to the uncompensated care regulations, those provisions found at 42 C.F.R. §§ 124.503(b), and 124.509(b), are, in my view, invalid.[19] I think that the Secretary may permissibly define, as in § 124.-503(a), certain levels of indigent care which will presumptively constitute compliance with the uncompensated care assurance. The infirmity in § 124.503(b), however, is that the carrying over of "deficits" in compliance levels goes well beyond defining compliance. Rather, the provision is a penalty and is therefore inconsistent with the statutory exception for financial infeasibility. The regulation is not limited to facilities that were able to meet the uncompensated care obligation without fiscal hardship, but rather applies to all facilities, including those that were legitimately within the express terms of the exception. Further, the fact that the regulation merely provides for a carry-over rather than a fine

or other sanction does not cure the infirmity because the effect in the future will be to impose uncompensated care obligations in excess of those specified by § 124.503(a) as reasonable.

With respect to § 124.509(b), I do not regard it as a fair definition of compliance for the Secretary to refuse to permit hospitals to consider as a part of their volume of uncompensated care, the difference between the normal charge for a service and that reimbursed by third party payors such as Medicare. Such a definition penalizes the hospital for accepting Medicare patients, a fact which is particularly inequitable in light of the fact that the community service regulations require the facility to do so. If Medicare does not pay the full, normal cost of a procedure, the hospital should be permitted to consider the balance as uncompensated care. To hold otherwise will permit the Government to establish what will constitute a reasonable volume of charity care in one regulation, and yet exact by means of a second regulation additional services for which the hospital will be paid, in many instances, less than the full charge.

Regarding the community service regulations, the Secretary has, in my opinion, overstepped her authority in promulgating §§ 124.603(d)(1) and .603(d)(2). These regulations provide:

> (d) *Exclusionary admissions policies.* A facility is out of compliance with its community service assurance if it uses an admission policy that has the effect of excluding persons on a ground other than those permitted under paragraph (a) of

---

**19.** Section 124.503(b) provides as follows:

> (b) Deficit in compliance—(1) Facilities assisted under Title VI—If in any fiscal year a facility assisted under Title VI of the Act fails to meet its annual compliance level, it shall provide uncompensated services in an amount sufficient to make up that deficit (as adjusted under paragraph (d)). The facility may make up a deficit at any time during its period of obligation or in the year or years (if necessary) immediately following, except where the facility failed to provide uncompensated services at the required level although financially able to do so, or where the

facility did not comply with the requirements of this subpart.

*Id.* Section 124.509(b) provides:

> A facility may not include the following in computing the uncompensated services it provides:
>
> (b) Any amount in excess of the payment that the facility has received, or is entitled to receive, from a third party insurer or under a governmental program where the facility has agreed or is otherwise required to accept this payment as payment in full for the services.

. . . . .

*Id.*

this section. Illustrative applications of this requirement are described in the following paragraphs:

(1) A facility has a policy or practice of admitting only those patients who are referred by physicians with staff privileges at the facility. If this policy or practice has the effect of excluding persons who reside (or for Title XVI facilities, are employed) in the community from the facility because they do not have a private family doctor with staff privileges at the facility, the facility would not be in compliance with its assurance. The facility is not required to abolish its staff physician admissions policy as a usual method for admission. However, to be in compliance with its community service assurance it must make alternative arrangements to assist area residents who would otherwise be unable to gain admission to obtain services available in the facility. Examples of alternative arrangements a facility might use include:

(i) authorizing the individual's physician, if licensed and otherwise qualified, to treat the patient at the facility even though the physician does not have staff privileges at the facility;

(ii) for those patients who have no physician, obtaining the voluntary agreement of physicians with staff privileges at the facility to accept referrals of such patients, perhaps on a rotating basis;

(iii) if an insufficient number of physicians with staff privileges agree to participate in a referral arrangement, requiring acceptance of referrals as a condition to obtaining or renewing staff privileges;

(iv) establishing a hospital-based primary care clinic through which patients needing hospitalization may be admitted; or

(v) hiring or contracting with qualified physicians to treat patients who do not have private physicians.

(2) A facility, as required, is a qualified provider under the Title XIX medicaid program, but few or none of the physicians with staff privileges at the facility or in a particular department or subdepartment of the facility will treat medicaid patients. If the effect is that some medicaid patients are excluded from the facility or from any service provided in the facility, the facility is not in compliance with its community service assurance. To be in compliance a facility does not have to require all of its staff physicians to accept medicaid. However, it must take steps to ensure that medicaid beneficiaries have full access to all of its available services. Examples of steps that may be taken include:

(i) obtaining the voluntary agreement of a reasonable number of physicians with staff privileges at the facility and in each department or subdepartment to accept referral of medicaid patients, perhaps on a rotating basis;

(ii) if an insufficient number of physicians with staff privileges agree to participate in a referral arrangement, requiring acceptance of referrals as a condition to obtaining or renewing staff privileges;

(iii) establishing a clinic through which medicaid beneficiaries needing hospitalization may be admitted; or

(iv) hiring or contracting with physicians to treat medicaid patients.

Both these provisions go far beyond the original promise by the hospitals to allow access to the facility by all members of the community, and instead have placed affirmative obligations on facilities either to alter their policies regarding the admission of physicians to their staffs or shoulder the burden of locating private doctors to treat those who have no physician with staff privileges, or to open clinics to serve such a purpose. While the Government ingenuously characterizes the above described methods as "examples" of ways in which compliance might be achieved, a careful reading indicates that adherence to the "examples" would be the only method of achieving "compliance."

With respect to the remaining regulations, although fuller factual development in the district court might demonstrate additional infirmities, I am not prepared to say at this juncture that the district court abused its discretion in refusing preliminary relief. As to those that I have described above, however, even bearing in mind the deference we are bound to give the Secretary's interpretation, *see Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965), I think that appellant has more than met its burden of showing a likelihood of success.

## II.

With respect to the remaining requirements for preliminary relief, I likewise think that the AHA has shown its entitlement to preliminary relief. The substantial alterations in hospital procedures which will be required in order to comply with the community service regulations involve not merely pecuniary damages, but additionally pose dangers that some facilities will be forced to lower their standards for staff admission or will be required to find some means of persuading already overburdened physicians to accept additional patients to avoid a finding that the facility is not in compliance. While I am not advocating that persons in need of treatment be turned away, I think that particularly with respect to those who are able to pay for care, a hospital may reasonably require such persons to make their own arrangements for a doctor. I do not, however, challenge the regulation requiring hospitals to treat all emergency cases. *See* 42 C.F.R. § 124.-603(b).

Regarding the uncompensated care regulations, I think that while the harm which may be suffered by the AHA facilities is essentially pecuniary, it nevertheless will be irreparable in the sense that facilities will never be able to recover for the excess services provided in efforts to comply with the cost of the regulations. Particularly in an era when hospitals are in increasing financial difficulties due to the fact that many are operating with high percentages of empty beds, such a burden should not be imposed.

Finally, regarding the "public interest" and "balancing" requirements, this litigation does not involve an assertion by AHA that its members should be permitted to deny care they are obligated to furnish under the terms of their assurances. Rather, it involves the question of whether HEW, which until recently failed to enforce any of the statutory obligations, has now, to make up for lost time, indulged in administrative overkill. Because this appears to me to be true with regard to the above mentioned regulations, I would reverse in part, as set forth herein, the district court's denial of preliminary relief.